# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 7, 2014

## STATE OF TENNESSEE V. ERIC WILLIAMS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 12-04164    James Lammey, Jr., Judge**

---

**No. W2013-01593-CCA-R3-CD  - Filed March 27, 2015**

---

A Shelby County Criminal Court Jury convicted the appellant, Eric Williams, of first degree premeditated murder, and the trial court sentenced him to life.  On appeal, the appellant contends that the evidence is insufficient to support the conviction, that the trial court erred by refusing to allow State witnesses to testify about his statements after the killing, that the trial court erred by allowing the State to use a shotgun for demonstrative purposes when the gun was not involved in the crime, and that the trial court erred by not using the "reasonable effort method" for the jury's consideration of the charge.  Based upon the record and the parties' briefs, we conclude that the trial court erred by prohibiting the appellant from cross-examining State witnesses about his stating after the shooting that he did not intend to shoot the victim, by allowing the State's expert to testify about the trigger pull of double-barrel shotguns, and by allowing the jury to handle a shotgun that was not the murder weapon. Moreover, we conclude that the cumulative effect of the errors warrants reversal of the appellant's conviction.  Therefore, the conviction is reversed, and the case is remanded to the trial court for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Reversed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN and TIMOTHY L. EASTER, JJ., joined.

Vicki M. Carriker (on appeal) and Michael Scholl and Michael Campbell (at trial), Memphis, Tennessee, for the appellant, Eric Williams.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Stacy McEndree and Marquis Young, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

# I. Factual Background

In July 2012, the Shelby County Grand Jury indicted the appellant for first degree premeditated murder in count 1 and employing a firearm during the commission of a dangerous felony in count 2.[1] The charges resulted from the shooting of William Frank Yancey.

Mamie Yancey, the victim's mother, testified that in December 2009, the victim was forty-five years old and lived with her on Burgess Drive in Memphis. Ms. Yancey's daughter, grandson, and granddaughter lived with them. On the night of December 18, the victim left home with the appellant. While the victim and the appellant were gone, the appellant's car was at Ms. Yancey's home. The victim returned home after midnight, ate, and talked on the telephone. At some point, Ms. Yancey heard the appellant's car pull into the driveway. She told the victim that someone was there, and the victim went outside. Ms. Yancey did not see the victim alive again.

On cross-examination, defense counsel asked Ms. Yancey if she knew the appellant, and she stated, "I just heard my son call his name." Defense counsel asked if the victim and the appellant were friends, and she answered, "Far as I know they were." She said that when the victim went outside, she did not hear him cursing or arguing with the appellant. She did not know if the victim left with the appellant, and the victim never told her that he was afraid of the appellant.

Marquise Relliford testified that the appellant and the victim lived near his cousin, Shelton Malone, and that he had known both of them for seven or eight years. On December 19, 2009, Malone dropped off Relliford at Chocolate City, a nightclub. Relliford said that the appellant and the victim were there but that he did not see the victim "till we left." Sometime between 2:00 and 3:00 a.m., Relliford left the club with the appellant, the victim, and a man he did not know. The four of them got into a Chevrolet Avalanche with the appellant sitting in the front passenger seat, the victim sitting behind the appellant, and

---

[1]The State failed to name the predicate felony in count 2. The only other offense alleged in the indictment, first degree murder, is not a "dangerous felony" as defined in Tennessee Code Annotated section 39-17-1324(i)(1). During the jury charge, the trial court instructed the jury that it could find the appellant guilty of employing a firearm during the commission of a dangerous felony only if it found him guilty of voluntary manslaughter as a lesser-included offense of first degree murder in count 1. Voluntary manslaughter is a "dangerous felony" pursuant to Tennessee Code Annotated section 39-17-1324(i)(1)(C). However, the indictment left the appellant with inadequate notice of the charge against him so that count 2 was void for lack of notice. See State v. Demeko Gerard Duckworth, No. M2012-01234-CCA-R3-CD, 2013 Tenn. Crim. App. LEXIS 398, at *58-60 (Nashville, May 10, 2013). Regardless, the jury acquitted the appellant of count 2.

Relliford sitting behind the driver. Relliford said that during the drive, the appellant and the victim began arguing and that the argument was "a little heated." Relliford stated that he told them to stop arguing and that they did so "for a minute." However, the arguing resumed. Relliford said he did not know what they were arguing about and did not want to be in the truck during the argument, so he told the driver to drop him off at Chevron Road and Shelby Drive. The driver dropped off Relliford, and that was the last time Relliford saw the victim alive.

Relliford testified that he had been drinking alcohol "all day" before he got to the club. He said that people consumed alcohol at Chocolate City and that he saw the appellant with "one cup in his hand." However, he never saw the appellant stumble or heard the appellant use slurred speech.

On cross-examination, Relliford testified that he began drinking alcohol about 2:00 p.m. on December 18 and that he consumed seven, twenty-four-ounce cans of beer before he got to the club about 11:00 p.m. He acknowledged that during the drive from the club, the appellant and the victim were intoxicated and extremely angry and that he was concerned their argument would become physical. He also acknowledged that the appellant and the victim were good friends.

Roderick Johnson testified that in December 2009, he lived on Burgess Drive and that the victim lived nearby. On the night of December 18, Johnson hosted a party for his wife at Chocolate City. He invited the victim, whom he had known about four years, and the victim invited the appellant, whom Johnson had known about three years. About 10:00 p.m., the appellant and the victim arrived at Johnson's house and rode with him in his Chevrolet Avalanche to the club. Johnson said that the victim "stayed on the dance floor" and that the appellant "stayed over talking to the other guy [Marquise]" for most of the night. Johnson did not know if they consumed alcohol.

Johnson testified that about 2:00 a.m., he and the victim went outside to leave the club. Johnson told the victim to go inside and get the appellant, and the appellant came out of the club with Marquise Relliford. The appellant expected Johnson to give Relliford a ride home. The victim told the appellant that the appellant should have asked Johnson first because Johnson did not know Relliford, and the appellant and the victim "kind of said a few words to each other." Johnson told the victim that he "didn't have a problem giving [Relliford] a ride."

Johnson testified that the appellant sat in the front passenger seat and that the victim sat directly behind the appellant. During the drive, the appellant and the victim continued to argue about Johnson's having to drive Relliford home. Johnson said that at some point,

he dropped off Relliford because "they was arguing so bad" that Relliford wanted out of the truck. Johnson stated that after Relliford got out, the appellant "got out of his seat to turn around to grab Frank in the neck." Johnson grabbed the appellant's arm, and the appellant "turned back around in his seat." The appellant told the victim that he had had enough of the victim's getting into his business and that he was going to do something to the victim. The victim told the appellant that he was not afraid of the appellant and that "go on and do what you got to do." The appellant told the victim, "[W]hen I do something to you, I'm going to make it count."

Johnson testified that when he got to the intersection of Chevron Road and Burgess Drive, he told the appellant and the victim to get out of his truck. Johnson said he drove down the street, turned around, and shined his headlights on the appellant and the victim. The appellant and the victim were pushing each other but stopped and "went to talking." Johnson said he heard the victim tell the appellant that they "needed to stop playing because somebody will eventually get hurt" and that the two men began walking. He said that he assumed they walked to the victim's house and that he drove to his own home. About five or ten minutes later, Johnson heard the appellant's Mustang "drive off." Ten to twenty minutes later, he heard the appellant's car again. During the night, Johnson learned that something had happened between the appellant and the victim. The police showed him a photograph array, and he identified the appellant's photograph.

On cross-examination, Johnson testified that he did not know if the appellant and the victim consumed alcohol or smoked marijuana before they went to the club. Johnson said he took "all kind[s]" of whiskey and liquor to the party and that he saw the appellant and the victim drinking alcohol out of cups. When the four men left the club, nothing indicated to Johnson that the other three had consumed alcohol. Johnson denied that the appellant and the victim were "tussling" in his truck and said that he dropped them off because "neither of them [would] be quiet."

Johnson acknowledged giving a statement to police about 7:00 a.m. on December 19 in which he stated that during the drive home, the appellant "got up several times wanting to hit Frank and I wouldn't let him do it." He also acknowledged telling the police that the appellant and the victim "tussl[ed]." Johnson explained to the jury, "That's [when] Eric got up to choke Frank, . . . and I just grabbed his arm." He acknowledged that he never told the police that the appellant "choked" the victim and said that he "[e]vidently . . . left it out." He stated that the victim never touched the appellant and that the appellant "got up out of his seat to grab Frank and to me they were just playing." Johnson said, "If I had [known] . . . the situation was [as] bad as it was, I never would have dropped both of them off where I dropped them off at . . . . That's why I dropped both of them off. Both of them knew each other before they knew me." Johnson acknowledged that he never told the police that the

-4-

appellant claimed he was going to "make it count."

Marquez Yancey, the victim's son, testified that in December 2009, he lived on Burgess Drive with the victim; his grandmother, Mamie Yancey; and his aunt. On the night in question, Marquez[2] saw the victim getting ready to go to a party. The victim went to the party with the appellant and "Rod," who was driving. Marquez said that when the victim returned home, the victim went to the victim's bedroom and was "[l]aying across his bed eating." The appellant knocked on the front door of the home and asked for the victim, so Marquez went to get the victim. He said the appellant and the victim walked into the front yard and appeared to be arguing or "exchanging words." Marquez stood at the window and watched them but could not hear what they were saying. Marquez said he noticed a gun in the appellant's hand but did not think anything of it because "I myself knew Eric. My daddy knew Eric, and I would have never thought that the things that happened would have happened. If I would have thought that, I would have did something different." Marquez saw the appellant and the victim leave in a Mustang.

On cross-examination, Marquez acknowledged that he was surprised about the shooting because the appellant and the victim "hung out together" and were good friends. When Marquez answered the door on December 19, the appellant did not appear to be angry and waited on the front porch while Marquez went to get the victim. The victim went outside, and Marquez heard both of them arguing. Marquez looked outside to see what was going on and saw the appellant holding a shotgun in his right hand. Marquez said that the appellant had his left arm around the victim and that, by that time, they appeared to be "just talking." The men talked for twenty to thirty minutes, got into the Mustang, and left. Marquez stated, "I would say that they were calmed down if my dad is getting in the car with him and they're pulling off together." On redirect examination, Marquez testified that the appellant and the victim were outside about forty minutes.

Candace Maples testified that she knew the victim and the appellant "[f]rom around the neighborhood" and that she had known them since she was a teenager. About 9:00 or 10:00 p.m. on December 18, 2009, Maples began "hanging out" with Shelton Malone and Marquise Relliford. She said that they were "riding around" in Malone's black SUV and that Relliford was not with them the entire time. Malone drove, and Maples sat in the front passenger seat.

Maples testified that at some point, she and Malone ended up at the appellant's house. Malone pulled up behind the appellant's Mustang, and the appellant's porch light was on so

_____

[2]Because the witness shares a surname with another witness, we will refer to him by his first name for clarity. We mean no disrespect to these individuals.

that Maples could see into the appellant's car. She said that the appellant was sitting in the driver's seat, that the victim was sitting in the passenger seat, and that "it looked like it was confrontation in the car." Maples saw the appellant using hand gestures and pointing, and the victim was "just looking" at the appellant. Maples said that she heard "a lot of fussing" and that Malone told the victim to get out of the Mustang and get into Malone's SUV. The appellant was "cussing" and said he was tired of the victim "F'ing with him."

Maples testified that the victim got into Malone's vehicle and sat behind her. Maples told the victim that the appellant was crazy, and the victim replied, "[Y]eah, he crazy." Maples said that the appellant's garage was open slightly and that she heard the appellant tell his son to "go get the gun." The appellant's son went into the house and came out with a shotgun. Maples acknowledged that she served in the military, spent time in Iraq, and was familiar with guns. She said that the gun was a twelve-gauge shotgun but that she could not see whether it was a single- or double-barrel shotgun. Maples said the appellant got the gun from his son and was "pacing back and forth, putting the gun in the garage and then getting it. He did that, like, two or three times." Maples said that she got out of Malone's SUV because she "felt like something was going to escalate" and that she asked the appellant's son why he got the gun.

Maples testified that she heard the appellant say twice, "I'm going to kill this [N*****]." The appellant was standing at the driver's side of Malone's vehicle. She said that the rear door on the driver's side was open and that the appellant was "jugging" the victim's side with the gun. The appellant's wife came outside, and the appellant shot the victim. Maples said that after the shooting, the appellant walked away and was "talking out loud" to himself. She said she heard the appellant say, "I told him to stop F'ing with me."

Maples testified that she went to the driver's side of the SUV. The victim was leaning to his left, and Maples pushed him over. The victim was hot from the gunshot, and blisters formed on Maples' hands from touching the victim. Maples found a pulse in the victim's neck, and Malone began driving them to the hospital. During the drive, the victim did not talk but shook his head. When they arrived at the hospital seven or eight minutes later, Maples could no longer find a pulse. Later that day, the police showed her a photograph array, and she identified the appellant as the shooter.

On cross-examination, Maples acknowledged that she had been drinking alcohol before the shooting. She said that she began drinking beer at 6:00 p.m. and that she continued to drink beer and vodka while she was riding around with Malone and Relliford. However, she denied that she was intoxicated. She said that sometime before the shooting, Malone drove to Chocolate City and dropped off Relliford. Maples said that she did not go into the club and that she saw the appellant in the parking lot.

Maples testified that when Malone pulled up in the appellant's driveway for the second time, the appellant got out of the Mustang, and Malone got out of the SUV. The appellant began telling Malone what was happening and seemed very angry and "hyped." Malone told the victim to get into the SUV and that he would take the victim home. Maples said that when the victim got into the SUV, she got out because she thought something bad was going to happen and did not want to be near the victim.

Maples acknowledged that she gave a statement to the police at 9:48 a.m. on December 19. She also acknowledged telling the police that when she and Malone pulled into the driveway, the appellant said, "[G]et this [N*****] out of this car and take him home." Maples acknowledged telling the police that she and Malone got out of the SUV and tried to calm down the appellant. She said she only remembered getting out of Malone's SUV one time: when the victim got into the vehicle. She also acknowledged that in her statement, she claimed that the appellant told his son to get the "shotgun" and that "they got to arguing again." She said that the appellant was the only person arguing and that the victim "wasn't saying nothing." She said that she saw the appellant shoot the victim but acknowledged that she did not say in her statement that she witnessed the shooting. She also did not say in her statement that she talked to the appellant's son or that the appellant said after the shooting, "I told him to stop F'ing with me." Regarding the inconsistencies between her statement and her testimony, she said that she was in shock when she gave her statement and that "[i]t's a lot of things I'm sure that I didn't tell then that I'm telling now." She noted that the shooting occurred four years before trial and that she "had been drinking then."

On redirect examination, Maples acknowledged that she previously failed to appear in court for a proceeding related to this case and that she was arrested and jailed. She said that the State had not promised her anything in exchange for her testimony and that the State did not tell her what to say. She said she never saw the victim with a weapon or put his hands on the appellant.

Shelton Malone testified that he was thirty-one-years old, that he and Candace Maples used to go to school together, and that he had known her since he was a teenager. Malone had known the victim for more than twenty years and the appellant about ten years, and both of them were older than Malone. On the night of December 18, 2009, Malone was "[j]ust riding around" with Maples and Malone's cousin, Marquise Relliford. At some point, Malone dropped off Relliford at Chocolate City. Neither Malone nor Maples went into the club. Afterward, Malone and Maples continued to ride around. Malone was driving his SUV, and Maples was sitting in the front passenger seat. Malone said that Maples was drinking alcohol but that he was not.

Malone testified that while he was driving on Chevron Road, he saw the appellant's

Mustang. The appellant was driving, alone, and speeding. Malone turned around and drove to the appellant's house. He pulled into the driveway behind the Mustang, which was "still running." Malone got out of his SUV and saw the appellant come out of the appellant's house. Malone said he did not remember if the appellant had anything in the appellant's hands. The appellant seemed angry, and Malone tried to talk to him. However, the appellant got into his Mustang and told Malone to let him out of the driveway. Malone backed out the SUV, and the appellant backed out the Mustang. Malone said that he tried to follow the appellant but that the appellant "pulled off too fast."

Malone testified that he took Maples to the store and that they returned to the appellant's house about ten minutes later. The Mustang was in the driveway, and Malone pulled in behind it. He saw two people in the car, and they appeared to be arguing because they were "face-to-face." Malone walked up to the Mustang and saw the appellant sitting in the driver's seat and the victim sitting in the passenger seat. Malone could not figure out what they were arguing about and told the victim to get into the SUV.

Malone testified that he got back into the driver's seat of the SUV and that the victim got into the back seat. The appellant opened the SUV's rear door on the driver's side and said, "Got me F'ed up." The appellant was yelling, cursing, and trying to hit the victim. Malone got out of the SUV and tried to move the appellant away from the vehicle but could not, so he went to the house to get the appellant's wife. Maples remained in the SUV.

Malone testified that he told the appellant's wife to "come get him" and that he saw the appellant poking the victim's side with a shotgun. The appellant's left hand was under the barrel of the gun, and his right hand was "[a]round the trigger." Malone heard Maples say, "You done shot him." Malone went to the SUV and saw that the victim had been shot. Maples climbed from the front seat to the back seat, and Malone lifted the victim's shirt and saw a hole in the victim side. The victim stated, "Why you let him do me like that."

Malone testified that he drove the victim to the hospital. When they arrived, the victim was not talking or breathing. About 8:30 a.m., five hours after the shooting, Malone gave a statement to the police. In the statement, he said that the first time he arrived at the appellant's house, he saw the appellant come out of the house with a gun. Malone also said in the statement that the appellant put the gun into the Mustang and that Malone "let him go on about his business." After the shooting, the police showed Malone a six-photograph array containing the appellant's photograph, and he identified the appellant as the shooter.

On cross-examination, Malone acknowledged that the appellant and the victim were his friends, that he never heard the appellant threaten to kill the victim, and that he did not want to testify against the appellant. He also acknowledged that when the victim got out of

the Mustang to get into Malone's SUV, the victim was angry. He said that he did not remember when the appellant got the gun and that he did not know if the appellant ever hit the victim. He acknowledged that he saw the appellant "poking" the victim with the gun but that he never saw the appellant's hand on the trigger. Instead, he assumed the appellant's hand was on the trigger. He also acknowledged that he never heard a gunshot.

Malone testified that he did not remember stating at a previous hearing that he did not see a gun until he heard Maples say that the appellant had shot the victim. He acknowledged that after the shooting, the appellant immediately dropped the gun in the grass, appeared distraught, and was crying. While Malone was driving the victim to the hospital, the appellant telephoned Malone several times. The appellant sounded upset but did not sound like he was crying. Malone said that police officers arrived at the hospital and that he talked with them in a police car. While Malone was in the car, he saw the appellant's Mustang. The appellant did not go into the hospital, and the Mustang turned around and left.

Lieutenant Alvin Moore of the Memphis Police Department (MPD) testified that on December 19, 2009, he responded to a "wounding" at Delta Medical. When he arrived, the victim's family was in the hallway. Lieutenant Moore learned the victim was deceased and viewed the body. The victim had a wound in his torso. At that time, Lieutenant Moore did not have knowledge of a suspect. He said that some of the victim's family members were standing outside the hospital, that they ran inside, and that they told him that "the suspect just drove up and left." Lieutenant Moore obtained the victim's personal items, including his clothing and a folding pocketknife that was with the clothing. The knife was open when Lieutenant Moore received it.

Officer Daemien Jefferson of the MPD testified that about 5:00 a.m. on December 19, 2009, he was dispatched to a home on Dawnridge Drive to "check for [a] possible crime scene" and the alleged suspect. Neither the suspect nor the suspect's car, a Mustang, were there. Officer Jefferson did not see any spent shell casings or blood at the scene.

Lieutenant Anthony Mullins of the MPD testified that on December 19, 2009, he went to the appellant's home on Dawnridge Drive to investigate the shooting. He knocked on the front door, but no one answered. Officers searched the property around the home but never found a weapon or shell casings. However, they collected a clear vodka bottle from some bushes and a tree-shaped air freshener that could have hung from a car's rearview mirror. The police developed the appellant as a suspect and began looking for him. They also began looking for appellant's wife and son as witnesses to the shooting. The police later returned to the home, and the appellant's son was there. They contacted the appellant's wife at work, and she came to the police department and gave officers consent to search her home. Officers searched the house but did not find a shotgun. In fact, the police never located the

-9-

weapon used in the killing. On December 21, 2009, the appellant voluntarily turned himself in to the police.

Officer Charles Cathey of the MPD testified that he assisted Lieutenant Mullins with processing Shelton Malone's SUV. The officers found a red substance that appeared to be blood in the back seat and collected a sample of the substance on a Q-tip swab. Officer Cathey dusted the vehicle for fingerprints but did not find any prints. On cross-examination, Officer Cathey testified that he was not advised that a shotgun had been used to shoot the victim. Therefore, he did not look in the SUV for a slug or pellets from a shotgun shell.

Marco Ross of the Shelby County Medical Examiner's Office testified as an expert in forensic pathology that he performed the victim's autopsy. The victim died of a shotgun wound to his left torso. The shot perforated his left tenth rib, spleen, colon, pancreas, kidneys, adrenal glands, aorta, liver, and diaphragm. Wadding material and pellets from the shotgun shell were in the victim's body. Dr. Ross described the wound as a "contact wound," meaning that the muzzle of the gun was in contact with the body when the gun was fired. He said he determined the wound was a contact wound from the "soot on the margin" of the wound and "a fairly well circumscribed ring like abrasion just below that wound."

Dr. Ross testified that the appearance of the wound was consistent with a double-barrel shotgun. The victim's toxicology report revealed that his blood contained alcohol in the amount of ".078 on the Breathalyzer scale." The report also showed the presence of marijuana and cocaine, meaning that the victim likely used marijuana and cocaine during the twenty-four-hour period before his death. X-rays revealed "bird-shot type projectiles or shotgun pellets" in the victim's body, and Dr. Ross collected numerous pellets. He said that the victim's shirt was heavily-soiled with blood, particularly on the left side, and that a defect in the shirt corresponded to the entrance wound on the body.

On cross-examination, Dr. Ross testified that the victim was five feet, nine inches tall and weighed 247 pounds. Regarding the victim's level of intoxication, Dr. Ross noted that the legal driving limit for intoxication in Tennessee was .08. The entrance wound was seven-eighths of an inch in diameter, and the lower ring-like scrape was three-fourths of an inch in diameter. Dr. Ross acknowledged that the barrels of a shotgun were side-by-side and that the orientation of the victim's wound indicated that the shotgun was turned sideways when it was fired. On redirect examination, Dr. Ross testified that the victim would not have died instantaneously, that he could have survived for several minutes and been conscious, and that his chance of surviving the type of wound he received was "quite small."

Special Agent Forensic Scientist Cervinia Braswell of the Tennessee Bureau of Investigation (TBI) Firearms Identification Unit testified as an expert in firearms

identification that she saw the pellets recovered from the victim and acknowledged that the pellets were consistent with "shot" or "bird shot." She also acknowledged that bird shot pellets were smaller than "buck shot"; therefore, a shotgun shell would hold more bird shot pellets than buck shot pellets. She said the average shell would contain 180 to 400 bird shot pellets, depending on the size of the shot.

Agent Braswell testified that each shotgun had a "trigger pull," which she described as the amount of pressure in pounds that was needed to pull the gun's trigger. She stated that the amount of pressure needed to push the button on a "walkie-talkie" was 2.09 pounds, that the amount of pressure needed to pull the trigger on a Windex bottle was four to five pounds, and that the amount of pressure needed to break the seal on a Coke can was six to seven pounds. Agent Braswell said she used the "weight free method" to determine the trigger pull for guns received by the TBI. She explained that the weight free method involved using a pole with a hook on one end, installing the hook over the trigger, and adding weights to the end of the pole until the trigger pulled. She acknowledged that different guns had different trigger pulls.

Agent Braswell testified that double-barrel shotguns could have one or two triggers and that a person could load one or both barrels. If the shotgun had two triggers, then the person could pull each trigger separately or both triggers simultaneously. At the State's request, Agent Braswell brought to court a double-barrel shotgun from the TBI's firearm reference collection. She explained that the shotgun had two triggers, and she showed the gun to the jury. She acknowledged that the gun was "older" and said that the trigger pull on each of the triggers was 7.25 pounds. The State offered to let the jurors pull the triggers on the unloaded shotgun for demonstrative purposes. The record reflects that four jurors "fired" the gun.

Agent Braswell testified that the trigger pull for shotguns varied "a little more" than the trigger pull for handguns and ranged from five to ten pounds. She said that the average trigger pull for a double-barrel shotgun was 5.6 pounds and that she had never seen a double-barrel shotgun without a safety catch. She said that if the "sear" mechanism for a trigger was worn, less pressure was needed to pull the trigger and that the trigger pull could be less than five pounds.

On cross-examination, Agent Braswell acknowledged that her testimony on the average trigger pull for double-barrel shotguns was based on "trigger pull statistic sheets," which included trigger pull tests conducted in California in the 1980s. However, she explained that the data she considered had been published in the Association of Firearm and Tool Mark Examiners's quarterly journal and that such data had to be peer-reviewed by a board of directors and "put out" to all members in order to be published. She stated that in

addition to the weight free method, trigger pull also could be determined with electronic or spring-loaded systems and that the three methods used to measure trigger pull had not changed since the 1980s. However, she acknowledged that the trigger pull data she considered for this case was based on a small sample of double-barrel shotguns and that she had no knowledge about the method used to collect the data or the calibration of the equipment used to collect the data.

Agent Braswell acknowledged that she could not say the appellant used a double-barrel shotgun to shoot the victim. She also never examined a gun related to this case and, therefore, did not know the trigger pull for the gun used in the shooting. She said that shotguns were manufactured in eight different gauges and that different manufacturers used different trigger pulls for their guns. She stated that trigger pull also could be affected by the cleanliness and wear of the gun, and she acknowledged that a gunsmith could "lighten" a trigger pull. She also acknowledged that many older shotguns did not have a safety catch and that a person typically did not hold a shotgun sideways when he or she fired it. Defense counsel asked Agent Braswell if a shotgun could have a "hair trigger" with a trigger pull of less than one pound, and she answered, "I suppose." However, she said that she had never seen or heard of such a gun and that a person would still have to pull the trigger in order for the gun to fire.

On redirect examination, Agent Braswell acknowledged that in order for a gun to fire, the safety catch had to be off, and a person had to pull the trigger. Even if a gun's sear mechanism was worn, lessening the trigger pull, a person still had to pull the trigger in order for the gun to fire. At the conclusion of Agent Braswell's testimony, the State rested its case.

Eric Williams, Jr., the appellant's son, testified that he was about to turn nineteen years old, was a student at Tennessee Tech, and worked for UPS. He acknowledged that he violated "the Rule" by being in the courtroom during Candace Maples' testimony, that it was wrong for him to be in the courtroom while she was testifying, and that he would not change his testimony based on she had said.[3]

Williams testified that on Friday, December 18, 2009, he had just turned fifteen years old. That day, he and his mother went to a Christmas party at church. When they got home, the appellant was getting ready to go to a party. The victim, who was a friend of the family

---

[3]After Officer Cathey's testimony, defense counsel advised the parties that he was going to call Eric Williams, Jr., as a witness. The State informed the court that Williams had been present in the courtroom during Maples's testimony and argued that he had intentionally violated the rule of sequestration. The trial court questioned Williams, and he apologized for "coming in here and disobeying the rules." The trial court determined that Williams could testify but that "he's going to do ten days after this trial is over with."

and like an uncle to Williams, also was there, and the men were not drinking alcohol or arguing. Later that night, the appellant returned home from the party, knocked on Williams's bedroom window, and rang the doorbell. Williams got out of bed and answered the door. He said that the appellant came into the house and was yelling, screaming, and cursing. The appellant wanted his shotgun, so Williams showed him the location of the gun. The appellant took the gun and left the house, telling Williams to lock the door. Williams looked outside and saw Shelton Malone's black SUV pull in behind the appellant's car. The appellant got into his Mustang, and Malone backed the SUV out of the driveway. The appellant also backed out, and both vehicles traveled in the same direction.

Williams testified that about two or three minutes later, he heard the appellant's Mustang arrive. Williams looked outside and saw the appellant and the victim in the car. He said they were "just talking" and "seemed to be normal." Malone's SUV pulled up behind the Mustang, and the victim got out of the car. Malone got out of the SUV, and the appellant got out of the Mustang. Williams said that "that's when my dad and Frank had an altercation. They were going back and forth with each other." The appellant and the victim were yelling, screaming, and cursing.

Williams testified that he went into the garage and watched what was happening. The victim was in the back seat on the passenger side of the SUV, and he and the appellant were still cursing and yelling at each other. The appellant walked by Williams and threw the shotgun onto a toolbox in the garage. The gun started to slide off the toolbox, so Williams grabbed it, and the appellant grabbed it away from him. The appellant went toward the driver's side of the SUV, and the victim told him that "you can't whoop me." The appellant pointed the gun at the victim, and they started "tussling" and "exchanging blows towards each other." Williams said the appellant was holding the gun in his left hand and using his right hand to punch the victim, who was "hitting back." The appellant looked like he was trying to hit the victim with the shotgun but, at the same time, he was still punching the victim with his right hand. Williams said that the next thing he knew, the victim pushed the appellant "up off of him," and Williams heard a "small pop." He went to the SUV and saw the victim "kind of tilted over."

Williams testified that after the shooting, the appellant "kind of broke down" and was crying and screaming. Everyone left, and Williams went to a friend's house because he "didn't want to be there." He acknowledged that the appellant was very angry during the altercation and said that the appellant was "nowhere near sober." He stated that he could smell alcohol on the appellant and that "the way he was acting, I knew he had to been drunk." Williams said the gun was a double-barrel shotgun that had been owned by his grandfather. The gun was old, unclean, and "rusted kind of." He said that the handle and stock were "kind of duct taped together" and that the barrel could be heard rocking back and forth if a

person "jiggle[d]" the gun. He described the gun as "like a medium size shotgun like something sort of like a Mossberg" and "a shorter kind though." He acknowledged that he missed the victim and that the victim was a "good man."

On cross-examination, Williams acknowledged that he did not know how much alcohol the appellant consumed or if the appellant used drugs before the shooting. Williams never saw the appellant take the shotgun out of the Mustang. The entire incident, from the time Williams heard the Mustang pull into the driveway until Malone drove the victim to the hospital, lasted forty-five minutes to one hour. Williams acknowledged that the appellant did not want Malone to drive the victim home and that the appellant wanted the victim to walk home. At some point, the victim held up his hands and said, "I'm done, I'm done." However, the appellant continued to argue, yell, and curse. The appellant used one hand to hold the shotgun and tried to hit the victim on the head with the gun. Williams saw the appellant put the gun in the victim's face but never saw him put it in the victim's side.

Williams testified that after the shooting, he "went blank." He did not see the appellant drop the gun or what the appellant did with it. He said the only thing he remembered after the shooting was holding down the appellant in the living room of their home. He acknowledged that he gave a statement to the police and that he never told them that he held down the appellant. Williams's parents left their home, and he thought they went to the hospital. However, he did not know if they went there. Williams also left the home but returned the next day. The police were not there, and Williams was at home alone all weekend. The police picked him up on Monday and took him to the police department. Williams did not see the appellant until later that day when the appellant came to the department and turned himself in to the police.

Williams acknowledged that he did not tell police that the gun was old, rusty, or rattled. He also did not tell them that duct tape was on the handle. He said he did not describe the gun to the police because "they didn't ask." He acknowledged that he never saw the victim with a knife or gun, that he never saw the victim get out of Malone's SUV, and that he never heard the victim threaten the appellant. He also acknowledged that he understood the trial court's instructions regarding witnesses not being allowed in the courtroom during the trial. He denied pressing his ear to the courtroom door in an attempt to hear the testimony. He said, though, that he stood near the door, trying to hear the testimony. He also came into the courtroom during Maples's testimony.

At the conclusion of the Williams's testimony, the jury convicted the appellant as charged of first degree premeditated murder. The jury found him not guilty of employing a firearm during the commission of a dangerous felony.

-14-

## II.  Analysis

### A.  Sufficiency of the Evidence

The appellant contends that the trial court erred by denying his motion for judgment of acquittal and that the evidence is insufficient to support the conviction.  Specifically, he contends that the evidence is insufficient because the "majority of eyewitnesses were drinking that day and night," making their credibility "extremely limited," and because the evidence fails to show that he premeditated killing the victim.  The State argues that the evidence is sufficient.  We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).  The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom.  State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).  Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact.  State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).  This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury.  Id.  Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient.  State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence.  State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998).  "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'"  State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)).  "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'"  State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

First degree murder is the premeditated and intentional killing of another person.  Tenn. Code Ann. § 39-13-202(a)(1).  A premeditated killing is one "done after the exercise of reflection and judgment."  Tenn. Code Ann. § 39-13-202(d).  The element of

premedition is a question of fact for the jury. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. Bland, 958 S.W.2d at 660. In State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000), our supreme court delineated the following circumstances from which a jury may infer premeditation:

> Declarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

The jury may also infer premeditation from the establishment of a motive for the killing and the use of multiple weapons in succession. State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004).

Taken in the light most favorable to the State, the evidence shows that in the early morning hours of December 19, 2009, the appellant and the victim left Chocolate City with Roderick Johnson and Marquise Relliford and that the victim became upset with the appellant for having Johnson give Relliford a ride. The appellant and the victim argued about the situation and continued to argue during the drive. In fact, the argument became so heated that Relliford asked Johnson to let him out of the truck. After Relliford got out, the appellant turned around in his seat to grab the victim, but Johnson stopped him. The appellant then threatened to do something to the victim and "make it count." The two men would not be quiet, so Johnson made them get out of the truck. The victim and the appellant walked to the victim's home on Burgess Drive, and the appellant got into his car and drove to his own home on Dawnridge. There, he woke his son, got his double-barrel shotgun, and returned to the victim's home. The victim and the appellant argued in the victim's yard, the victim left with the appellant, and the appellant drove them back to his home. Candace Maples and Shelton Malone pulled up behind the appellant's Mustang and saw the appellant and the victim arguing in the car. Malone told the victim to get into Malone's SUV so he could take the victim home. The victim got into the back seat of the vehicle, but the appellant approached him on the driver's side and poked him in the side with the gun. The appellant was holding the gun with both hands and had one hand on the barrel and the other near the trigger, and Maples heard him say twice that he was going to kill the victim. When the appellant's wife came outside, the appellant shot the victim in the torso.

Although the appellant contends that the evidence fails to show that he premeditated killing the victim, the evidence demonstrates that the appellant procured his shotgun, declared his intent to kill the victim, and that the victim was unarmed. The evidence also

shows that the victim did not provoke the appellant. The State's witnesses testified that the appellant became physically aggressive with the victim but that the victim never touched the appellant. Even the appellant's son acknowledged that the victim threw up his hands before the shooting and stated, "I'm done, I'm done." The appellant also failed to provide aid or assistance to the victim, and Maples testified that the appellant walked away after the shooting and stated that "I told him to stop F'ing with me," demonstrating the appellant's calmness after the shooting. In sum, the jury could infer premeditation from all of the factors delineated in Bland. Furthermore, the credibility of the witnesses was within the purview of the jury. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). In the instant case, the jury clearly resolved any issues of credibility and any inconsistencies in the testimony in the State's favor. We may not now reconsider the jury's credibility assessment. We conclude that the evidence is more than sufficient to show that the appellant intentionally and with premeditation killed the victim.

## B. Appellant's Statements

The appellant contends that the trial court erred by ruling that statements he made immediately after the shooting were inadmissible and that the trial court's error prevented him from presenting his defense of acting recklessly. The State argues that the appellant is not entitled to relief because he was able to present the defense through his son, who testified that the appellant was distraught after the shooting, and that the trial court's error was harmless in light of the overwhelming evidence against him. We agree with the appellant that the trial court erred but conclude that the error, taken alone, was harmless.

At trial, the appellant argued that Candace Maples and Shelton Malone should be allowed to testify that after the shooting, the appellant stated that he did not mean to shoot the victim. Defense counsel contended that the statements qualified as excited utterances, but the trial court ruled that such "self-serving hearsay" was never admissible. The appellant made offers of proof regarding the witnesses' proposed testimony. During Maples's proffer, defense counsel asked if she remembered telling a police officer at the hospital that the appellant stated after the shooting, "I didn't mean to do that." Maples answered, "No, I don't." The trial court ruled that defense counsel could question Maples about her statement to the officer as impeachment evidence. During Malone's proffer, the State asked if he heard the appellant say anything immediately after the shooting, and Malone said no. Malone stated, though, that during the drive to the hospital, the appellant telephoned Malone multiple times and claimed five or six times that he did not intend to shoot the victim. On cross-examination, Malone acknowledged giving a statement to the police in which he stated as follows: "I ran back to the truck to check and see if he was shot, but I didn't see no hole or nothing but I seen a lot of blood. [The appellant] got to crying saying he ain't tried to do it

and all that. I said man, I ain't got nothing to do with that." The trial court reiterated that self-serving hearsay was inadmissible but that the defense also could cross-examine Malone about his statement to the police. Later, the trial court ruled that if the appellant chose to admit Malone's statement into evidence pursuant to Tennessee Rule of Evidence 803(5), the hearsay exception for past recollection recorded, the appellant's self-serving statements would have to be redacted. The appellant maintains that the trial court should have allowed Maples and Malone to testify about his statements as substantive evidence and that Malone's entire statement was admissible pursuant to Rule 803(5).

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible during a trial, unless the statement falls under one of the exceptions to the rule against hearsay. See Tenn. R. Evid. 802. Our supreme court has stated that generally, "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere in the absence of abuse appearing on the face of the record." Pylant v. State, 263 S.W.3d 854, 870 (Tenn. 2008). The appellant concedes that his statements were hearsay. He no longer argues that they were admissible under the excited utterance exception to the hearsay rule but argues that they were admissible under res gestae and to show his state of mind.

Our supreme court has stated as follows regarding a defendant's self-serving statements:

> "A self-serving declaration is excluded because there is nothing to guarantee its testimonial trustworthiness. If such evidence were admissible, the door would be thrown open to obvious abuse: an accused could create evidence for himself by making statements in his favor for subsequent use at his trial to show his innocence."

State v. King, 694 S.W.2d 941, 945 (Tenn. 1985) (quoting Hall v. State, 552 S.W.2d 417, 418 (Tenn. Crim. App. 1977)). However, "no general rule of evidence excludes statements merely because they are self serving. Instead, most self-serving statements are excluded . . . because they constitute inadmissible hearsay." Tony A. Phipps v. State, No. E2008-01784-CCA-R3-PC, 2010 Tenn. Crim. App. LEXIS 846, at *24 (Knoxville, Oct. 11, 2010) (internal citations omitted); see also Neil P. Cohen et al., Tennessee Law of Evidence, § 8.08[3][a] n.405 (6th ed. 2011) (stating that "[t]he self-serving nature of the statement is immaterial under . . . most hearsay exceptions").

Moreover, in State v. Paul Anthony Dejongh, this court held that a trial court erred by

limiting the defendant's cross-examination of State witnesses about the defendant's self-serving statements. No. 03C01-9806-CR-00211, 1999 Tenn. Crim. App. LEXIS 130, (Knoxville, Feb. 16, 1999). Specifically, the trial court refused to allow the defendant to question two witnesses about statements he made concerning the necessity to shoot the victim. Id. at *11-12. Relying on State v. Robinson, 622 S.W.2d 62, 71 (Tenn. Crim. App. 1981), this court explained,

> When the state offers witnesses to testify concerning statements of the defendant, which imply an admission of guilt, the defendant is entitled through cross-examination to establish the defendant was acting in self-defense in homicide cases. . . . It would be the function of the jury to determine if such defense, under the facts in this record, was credible." Id. at *15-16. Furthermore, this court refused to find the error harmless, concluding that the testimony of the two witnesses was "crucial to establish some explanation as to why the defendant believed it necessary to kill the victim.

Id. at *17.

In our view, the facts and circumstances of the instant case are similar to Dejongh. The State's witnesses gave extensive and damaging testimony about statements the appellant made from the time he left Chocolate City until Maples and Malone left for the hospital with the dying victim. Maples even testified that immediately after the shooting, she heard the appellant say, "I told him to stop F'ing with me." Therefore, we believe the appellant was entitled to cross-examine the witnesses about self-serving statements he made to establish that he did not intentionally shoot the victim.

We also agree with the appellant that his statements were admissible to show his state of mind. Tennessee Rule of Evidence 803(3) provides that the following is not excluded by the hearsay rule:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

The appellant's stating immediately and again shortly after the incident that he did not intend

-19-

to shoot the victim would fall under this exception. Therefore, the trial court erred by ruling that he could not question Maples and Malone about his statements. Likewise, the trial court erred by ruling that if the appellant chose to admit Malone's four-page statement into evidence pursuant to Tennessee 803(5),[4] his self-serving statements would have to be redacted.

The appellant contends that the trial court's erroneous exclusion of the evidence deprived him of his right to present a defense. Again, we agree with the appellant. The Sixth Amendment and the Due Process Clause of the Fourteenth Amendment of the United States Constitution guarantee a criminal defendant the right to present a defense. State v. Brown, 29 S.W.3d 427, 432 (Tenn. 2000). Moreover, a defendant's constitutional right to confront the witnesses against him includes the right to conduct meaningful cross-examination. State v. Wyrick, 62 S.W.3d 751, 770 (Tenn. Crim. App. 2001). However, in many situations, the appellant's due process right "'must yield to other legitimate interests in the criminal trial process.'" Id. at 432 (quoting Chambers v. Mississippi, 410 U.S. 284, 295 (1973)). To this end, "[s]o long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." State v. Flood, 219 S.W.3d 307, 316 (Tenn. 2007). To determine whether a defendant's due process right to present a defense has been violated by the exclusion of evidence, we must consider:

> (1) Whether the excluded evidence is critical to the defense;
>
> (2) Whether the evidence bears sufficient indicia of reliability; and
>
> (3) Whether the interest supporting exclusion of the evidence is substantially important.

Id. at 316 (citing Brown, 29 S.W.3d at 434-35; State v. Rice, 184 S.W.3d 646, 673 (Tenn. 2006); State v. Rogers, 188 S.W.3d 593, 614 (Tenn. 2006)).

---

[4]Tennessee Rule of Evidence 803(5) provides as follows:

> Recorded Recollection - A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness's memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

The trial court ruled that the appellant could cross-examine Maples and Malone about their statements to the police for impeachment purposes but that the evidence was not admissible substantively. The "two types of proof clearly are not equivalent" in that a "jury considers impeachment proof only when assessing the credibility of witnesses." Brown, 29 S.W.3d at 432 n.11. Furthermore, the appellant did not testify on his own behalf. Therefore, his being allowed to cross-examine the witnesses about his statements after the shooting was critical to his defense. The evidence bore a sufficient indicia of reliability in that Maples and Malone reported the appellant's statements to the police soon after the shooting. Finally, no interest supported exclusion of the evidence. Therefore, we conclude that exclusion of the evidence amounted to a constitutional violation. As such, the constitutional harmless error standard is applicable, and the State bears the burden of demonstrating that the error is harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 24 (1967); State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008).

The State argues that the appellant was able to present the defense that he acted recklessly through his son, who testified that the appellant was distraught after the shooting. However, the fact that the appellant was distraught does not equate to his stating that he did not intend to kill the victim. Regardless, we conclude that the State has carried its burden of demonstrating harmless error beyond a reasonable doubt. The evidence overwhelmingly established that the appellant was angry with the victim; that he obtained his shotgun, drove to the victim's home, and drove the victim back to his own house; that he threatened to kill the victim; and that he accosted the victim and poked the victim with the weapon even after the victim had tried to remove himself from the situation. Therefore, in light of the overwhelming evidence of the appellant's guilt, we are convinced that this error alone was harmless beyond a reasonable doubt.

## C. Shotgun Evidence

The appellant contends that the trial court erred by allowing Agent Braswell to testify as an expert in firearms identification because the State "never provided counsel with the materials and reports that Braswell relied upon to testify as an expert in shotgun pulls. [The] State did not notify defense counsel until the Monday of trial that she was going to present Agent Braswell as an expert witness." The appellant also contends that he was prejudiced by the trial court's allowing the jury to handle a shotgun not used in the killing. The State argues that the trial court properly allowed Agent Braswell to testify because the record fails to show that the appellant filed a Rule 16 motion for discovery. Regarding the shotgun, the State argues that the trial court did not abuse its discretion by allowing the State to use the gun as a demonstrative exhibit and that, in any event, the trial court instructed the jury twice on the proper consideration of the evidence. We conclude that, under the facts of this case, the trial court's allowing Agent Braswell to testify about the trigger pull of various shotguns

and allowing the jury to handle the TBI's gun was error. Moreover, given the constitutional error discussed above, we conclude that the appellant's conviction must be reversed.

Before Agent Braswell's testimony, defense counsel argued in a jury-out hearing that it had learned "right here at the time of trial" that the State intended to have the agent testify. The State advised the trial court that the agent's testimony was necessary to explain to the jury how double-barrel shotguns operated and the "trigger pull averages" for shotguns. The State noted that the witness "can't say what the exact trigger pull on the particular weapon involved used was because she wasn't given a weapon to compare her test." The State also advised the trial court that, at the State's request, Agent Braswell had brought a double-barrel shotgun to court

> so that jury can see what [it] looks like as far as sizing. She
> would say it's . . . for an illustrative or demonstrative purpose.
> And I would also ask if the jury or if the judge would allow as
> we have done previously to give the jury an opportunity to pull
> the trigger if they should so want to do so.

Defense counsel responded that "you've got to be kidding me" and argued that the trigger pull of the TBI's gun was irrelevant because "I've handled plenty of guns and I know that each gun is different." Defense counsel later argued as follows:

> So we are going to allow this jury -- let me get this straight for
> the record. We're going to allow this jury to come in here and
> pull the trigger of a weapon that we don't know is the same type
> of weapon, don't know if it's the same brand of weapon, don't
> know if it's the same caliber of weapon, don't know if it's the
> same gauge of weapon, even if it's the same type of shotgun.
> We don't know any of those things, but we're going to let that
> jury touch that weapon in order to make a determination [on
> trigger pull].

Defense counsel asked if the State was going to introduce the TBI's shotgun into evidence, and the State said no.[5]

The trial court noted that defense counsel would have the opportunity to talk with

---

[5]As part of his argument, the appellant claims that the trial court erred by allowing the State to introduce the TBI's shotgun into evidence. However, the record confirms that the State did not introduce the gun.

Agent Braswell before her testimony, that the defense could "cross-examine the heck out of her on all that stuff," and that "it wasn't the State's fault that this gun was not to be found." The trial court ruled that because the burden was on the State to show that the appellant shot the victim intentionally, the witness could testify about the trigger pull of double-barrel shotguns and that the jury could pull the trigger on the State's demonstrative shotgun because "[i]t's the best proof that they have."

Regarding the appellant's claim of the State's Rule 16 violation, Tennessee Rule of Criminal Procedure 16 governs the discovery rights of parties in criminal proceedings. In pertinent part, Rule 16(a)(1)(G) provides that

> [u]pon a defendant's request, the state shall permit the defendant to inspect and copy or photograph the results or reports of physical or mental examinations, and of scientific tests or experiments if:
>
> (i) the item is material to preparing the defense;
>
> (ii) the government intends to use the item in its case-in-chief at trial; or
>
> (iii) the item was obtained from or belongs to the defendant.

Rule 16 does not explicitly mandate the sanction a court should impose on the State after failure to comply with a discovery order; instead, the rule provides that the court may enter such sanction "'as it deems just under the circumstances.'" State v. Collins, 35 S.W.3d 582, 585 (Tenn. Crim. App. 2000) (quoting Tenn. R. Crim. P. 16(d)(2)). A trial court has great discretion in fashioning a remedy for non-compliance with a discovery order, and the sanction imposed should fit the circumstances of the case, id. at 585, but suppression of evidence upon a Rule 16 violation is a drastic remedy reserved for the most flagrant of violations, see State v. House, 743 S.W.2d 141, 146 (Tenn. 1987).

"The provisions of Rule 16 are triggered only by the request of a defendant. If the defendant failed to request these items via a Rule 16 motion filed prior to trial, he cannot establish a violation of the rules of discovery." State v. Phillip Matthew Burgess, No. M2013-00252-CCA-R3-CD, 2014 Tenn. Crim. App. LEXIS 82, at *20 (Nashville, Jan. 28, 2014). As noted by the State, nothing indicates that the appellant filed such a request in this

case.[6] Moreover, the appellant bears the burden of demonstrating "the degree to which the impediments to discovery hindered trial preparation and defense at trial." State v. Brown, 836 S.W.2d 530, 548 (Tenn. 1992). The appellant did not request a continuance, which was a possible remedy, in order to investigate Agent Braswell's tests or obtain his own expert. He also failed to present any such expert at his motion for new trial hearing. See Tenn. R. App. P. 36(a). Therefore, we agree with the State that the appellant is not entitled to relief based on the State's alleged Rule 16 violation.

Nevertheless, we conclude that the trial court erred by allowing Agent Braswell to testify. In order to be admissible, evidence must be relevant to an issue at trial. Tenn. R. Evid. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. It is within the trial court's discretion to determine whether the proffered evidence is relevant; thus, we will not overturn the trial court's decision absent an abuse of discretion. See State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995). "Under this standard, we will not reverse unless the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Cannon, 254 S.W.3d 287, 295 (Tenn. 2008) (internal quotations and citations omitted).

In this case, Agent Braswell, whom we note the State qualified as an expert in firearms identification, was allowed to testify about the trigger pull of various shotguns, most of which had nothing to do with this case. Agent Braswell herself testified that shotguns were manufactured in eight different gauges, that different manufacturers used different trigger pulls for their firearms, and that trigger pull could be affected by the cleanliness and wear of a gun. However, the State had no evidence about the appellant's weapon except that it was an old, double-barrel shotgun, possibly a twelve gauge. Therefore, we conclude that Agent Braswell's testimony was irrelevant and, even if marginally relevant, that the testimony's probative value was substantially outweighed by the danger of its confusing the jury.

We will now turn to the trial court's allowing the jury to handle a shotgun not involved in the victim's death. The use of demonstrative evidence rests within the sound discretion of the trial court. See State v. Anton Mayhew, No. W2009-02184-CCA-R3-CD, 2011 Tenn. Crim. App. LEXIS 507, *23 (Jackson, July 8, 2011). Here, the appellant's sole

---

[6]The appellant does not address whether he requested discovery. If in fact that is the case, we are perplexed that defense counsel would fail to file such a request in a first degree murder case.

defense was that he did not intend to shoot the victim. During defense counsel's closing argument, he described this case as "a sad, sad tragedy" caused by the appellant's "horrible reckless act." Defense counsel then argued that the appellant and the victim were "fighting back and forth literally" and that the gun "[went] off while [the appellant] was poking right up against [the victim's] side." Obviously, the trigger pull of the appellant's shotgun was highly relevant. The trigger pull of any other shotgun, though, was not relevant, and the trial court's decision to allow the jurors to experience the trigger pull on a shotgun that was not the murder weapon was clearly error.

Next, we must determine the effect of the error, specifically whether the error "'more probably than not affected the judgment or would result in prejudice to the judicial process.'" Rodriguez, 254 S.W.3d at 371 (quoting Tenn. R. App. P. 36(b)). As stated previously, the evidence against the appellant was strong. Moreover, after four of the jurors dry-fired the TBI's shotgun, the trial court instructed the jury that the gun was not the weapon involved in the case and that its purpose was only to assist "the jury in comprehending the other evidence." Generally, we presume that a jury has followed the trial court's instructions. See State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). However, we fail to see how the jury's pulling the trigger on a gun that was not used in the shooting could assist the jury in comprehending the evidence in this case. Therefore, the egregious nature of this error, combined with Braswell's improper testimony and the constitutional violation discussed previously, leads us to conclude that the appellant's conviction must be reversed because the cumulative effect of the errors was not harmless.

## D. Jury Instructions

Finally, the appellant contends that the trial court erred by not using the "reasonable effort method" to charge the jury. The State argues that the trial court properly gave sequential jury instructions. We agree with the State.

In its final instructions to the jury, the trial court stated that the first count of the indictment charged the appellant with first degree premeditated murder, which included the lesser-included offenses of second degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide. The trial court instructed the jury, "You will consider each lesser-included offense only after you unanimously find the defendant not guilty of the greater offense in the order presented." The trial court charged the jury on first degree premeditated murder and its lesser-included offenses, and the jury convicted him of the greater offense.

A defendant has a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). We have previously noted that "[w]e must

-25-

review the entire [jury] charge and only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995). Generally, a charge "is erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). "In order to determine whether a conviction should be reversed on the basis of an erroneous instruction to the jury, this Court must consider whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." State v. James, 315 S.W.3d 440, 446 (Tenn. 2010) (citations omitted). "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005).

The appellant contends that his constitutional right to a jury trial was violated by the trial court's instruction that the jury could not consider lesser-included offenses until it unanimously acquitted him of first degree murder. In support of his argument, he quotes a concurring opinion in which Justice Wade "opined that the reasonable efforts method would eliminate the possibility of coercion, encourage jurors to consider alternatives, and weigh all possibilities. This would allow a more carefully considered verdict, instead of a 'forced commitment absent any knowledge of the alternatives.'" State v. Davis, 266 S.W.3d 896, 912 (Tenn. 2008) (Wade, J., concurring). The appellant acknowledges that the instructions given in the instant case are currently recognized as the proper method of instruction in Tennessee courts but contends that "the best method is the reasonable efforts method as suggested by the honorable Judge Gary Wade."

Initially, we note that the State argues that we can only review this issue for plain error because the appellant failed to object to the jury instructions. However, our review of the trial transcript reveals that defense counsel objected to "the order of considering the offenses that you have to acquit on first degree murder before you can get to second degree murder and so forth." Therefore, the appellant properly preserved this issue for our review.

As to the appellant's claim, all of the justices deciding Davis, including Justice Wade, concluded that "acquittal-first instructions" do not violate a defendant's right to trial by jury. Id. at 910 (Wade, J., concurring) (stating that "[t]he majority concludes that the instruction meets constitutional muster, and I am inclined to concur with that assessment"). Instead, Justice Wade stated that "as a matter of practicality and for sound policy reasons," Tennessee should "adopt the reasonable efforts instruction," which allows jurors to consider lesser-included offenses if they cannot reach a verdict with respect to the greater offense. Id. at 911. Moreover, as noted by the State, "no intervening development" has changed the ruling in Davis regarding the constitutionality of acquittal-first instructions. Therefore, we conclude that the appellant is not entitled to relief on this issue.

### III.  Conclusion

Based upon the record and the parties briefs, we conclude that the trial court erred by prohibiting the appellant from cross-examining State witnesses about his stating after the shooting that he did not intend to shoot the victim and that the trial court erred by allowing the jury to pull the trigger on a shotgun that was not the murder weapon.  Moreover, we conclude that the cumulative effect of the errors warrants reversal of the appellant's conviction.  Therefore, the appellant's conviction of first degree premeditated murder is reversed, and the case is remanded to the trial court for a new trial.

_____
NORMA MCGEE OGLE, JUDGE